LAURENCE F. PULGRAM (CSB NO. 115163)
lpulgram@fenwick.com
JENNIFER L. KELLY (CSB NO. 193516)
jkelly@fenwick.com
GUINEVERE L. JOBSON (CSB NO. 251907)
gjobson@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:  (415) 875-2300
Facsimile:   (415) 281-1350

Attorneys for Defendants
IAC/INTERACTIVECORP and
CITYSEARCH, LLC

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MENAGERIE PRODUCTIONS, an
Oregon general partnership, and
REDWOLF, LLC, a South Carolina
limited liability company, on behalf of
themselves and all others similarly
situated,

                              Plaintiffs,

          v.

IAC/INTERACTIVECORP, a
Delaware Corporation; CITYSEARCH,
LLC, Delaware limited liability
company; and DOES 1 through 20,
inclusive,

                              Defendants.

Case No. CV 08-04263 CAS (FMOx)

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

Date:      October 5, 2009
Time:      10:00 a.m.
Ctrm:      Courtroom F, 9th Floor
Judge:    Honorable Christina A. Snyder

**REDACTED FOR PUBLIC FILING**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................1

II.    FACTUAL BACKGROUND.........................................................................3

    A.     Citysearch and Its Pay-per-Click Advertising Model ..........................3

    B.     Citysearch Does Not Guarantee the Validity or Quality of Clicks .......4

    C.     Citysearch Employs Numerous Click Fraud Detection Methods ........6

    D.     Advertisers' Experiences with Citysearch ..........................................8

        1.     Advertisers Enroll in the PPC Program in a Variety of Ways.........................................................................................8

        2.     Key Terms of the Contracts Are Unique to the Advertiser .......9

        3.     Advertisers' Expectations Vary ...............................................9

        4.     Ad Content and ROI Vary ..................................................... 10

        5.     Some Advertisers Obtain Refunds/Chargebacks.................... 11

    E.     Plaintiffs Submit No Evidence That They or Any Other Class Members Were Charged for Invalid Clicks ......................................... 12

    F.     Citysearch Does Not Maintain the Click Data Necessary for Plaintiffs' Proposed "Analysis"......................................................... 13

III.   LEGAL STANDARDS ................................................................................ 14

IV.    PLAINTIFFS DO NOT SATISFY THE TYPICALITY REQUIREMENT...................................................................................... 15

V.     PLAINTIFFS DO NOT SATISFY THE ADEQUACY REQUIREMENT...................................................................................... 17

VI.    INDIVIDUAL ISSUES OVERWHELMINGLY PREDOMINATE........... 19

    A.     Plaintiffs Have No Classwide Method of Proving Liability .............. 19

    B.     Plaintiffs Have No Classwide Method Of Proving Damages ........... 24

    C.     Individual Issues Predominate on Each of Plaintiffs' Claims............ 25

        1.     Breach of Contract Claim ...................................................... 25

        2.     Implied Covenant Claim ........................................................ 27

        3.     UCL Claim ............................................................................ 28

VII.   CONCLUSION............................................................................................ 30

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4

*Akkerman v. Mecta Corp., Inc.,*
152 Cal. App. 4th 1094 (2007) ................................................................. 16, 17

5

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group, L.P.,*
247 F.R.D. 156 (C.D. Cal. 2007) .................................................................. 24

6

*Amchem Prods. v. Windsor,*
521 U.S. 591 (1997) ....................................................................... 14, 18, 19

7

*Bell Atl. Corp. v. AT&T Corp.,*
339 F.3d 294 (5th Cir. 2003) ........................................................................ 25

8

9

*Bishop v. Petro-Chemical Trans., LLC,*
582 F. Supp. 2d 1290 (E.D. Cal. 2008) ........................................................ 15

10

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.,*
141 F.R.D. 144 (N.D. Cal. 1991) .................................................................. 14

11

*Carma Dev., Inc. v. Marathon Dev. Cal., Inc.,*
2 Cal. 4th 342 (1992) ................................................................................... 27

12

*Caro v. Proctor & Gamble Co.,*
18 Cal. App. 4th 644 (1993) ......................................................................... 17

13

*Consol. World Invs. v. Lido Preferred Ltd.,*
9 Cal. App. 4th 373 (1992) ........................................................................... 26

14

15

*Cornn v. United Parcel Serv.,*
2005 WL 2072091 (N.D. Cal. Aug. 26, 2005) ............................................ 21

16

*Doninger v. Pacific Northwest Bell, Inc.,*
564 F.2d 1304 (9th Cir. 1977) ...................................................................... 14

17

*Dukes v. Wal-Mart, Inc.,*
509 F.3d 1168 (9th Cir. 2007) ...................................................................... 15

18

*Edwards v. First Am. Corp.,*
251 F.R.D. 454 (2008) ..................................................................... 19, 21, 28

19

20

*Gartin v. S&M Nutec LLC,*
245 F.R.D. 429 (C.D. Cal. 2007) ...................................................... 15, 17, 18

21

*Gen. Tel. Co. of Southwest v. Falcon,*
457 U.S. 147 (1982) ...................................................................................... 16

22

*Gonzalez v. Proctor & Gamble Co.,*
247 F.R.D. 616 (S.D. Cal. 2007) ................................................................... 16

23

24

*Hanon v. Dataproducts Corp.,*
976 F.2d 497 (9th Cir. 1992) .................................................................. 14, 15

25

*Hodes v. Van's Int'l Foods,*
2009 WL 2422214 (C.D. Cal. July 23, 2009) ............................................. 30

26

*Hodes v. Van's International Foods, et al.,*
2009 WL 2424214 (C.D. Cal. July 23, 2009) ............................................. 17

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Paxil Litig.*,
212 F.R.D. 539 (C.D. Cal. 2003) ............................................................. 15

*In Re Tobacco II*,
46 Cal. 4th 298 (2009) ............................................................................. 18

*Kelley v. Microsoft*,
251 F.R.D. 544 (W.D. Wash. 2008) ................................................... 14, 15

*Kurihara v. Best Buy Co., Inc.*,
2007 WL 2501698 (N.D. Cal. 2007) ...................................................... 21

*Leirboe v. State Farm Mut. Auto Ins. Co.*,
350 F.3d 1018 (9th Cir. 2003) ................................................................ 17

*Lozano v. AT&T Wireless Servs., Inc.*,
504 F.3d 718 (9th Cir. 2007) ........................................................... 16, 28

*Maddock v. KB Homes, Inc.*,
248 F.R.D. 229 (C.D. Cal. 2007) ........................................................... 14

*Motors, Inc. v. Times Mirror Co.*,
102 Cal. App. 3d 735 (1980) ................................................................ 28

*Multi-Ethnic Immigrant Workers Organizing Network v. Los Angeles*,
246 F.R.D. 621 ....................................................................................... 17

*Negrete v. Allianz Life Ins. Co.*,
238 F.R.D. 482 (C.D. Cal. 2006) (Snyder, J.) ..................................... 19

*O'Connor v. Boeing North American*,
197 F.R.D. 404 (C.D. Cal. 2000) ........................................................... 15

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ................................................................................ 16

*Peoples v. Sebring Capital Corp.*,
2002 WL 406979 (N.D. Ill. March 15, 2002) ....................................... 26

*Rodriguez v. Gates*,
2002 WL 1162675 (C.D. Cal. May 30, 2002) ................................. 15, 17

*Scott v. Mascott*,
1999 WL 33117204 (W.D. Wash. Apr. 13, 1999) ................................ 17

*South Bay Chevrolet v. General Motors Acceptance Corp.*,
72 Cal. App. 4th 861 (1999) ............................................................. 29, 30

*Stern v. AT&T Mobility Corp.*, 2008 W.L. 4382796 (C.D. Cal. Aug.
22, 2009) ...................................................................................... 19, 20, 30

*Zinser v. Accufix Res. Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001) ......................................................... 19, 23

## STATUTES

Cal. Bus. & Prof. Code § 172000 *et. seq.* ............................................. 18

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES
## (continued)

Page(s)

## RULES

Rule 23 ................................................................................................. *passim*
Rule 23(a) ...................................................................................................... 14
Rule 23(b)(3) .................................................................................................. 14
Rule 23(b)(3)(D) ............................................................................................ 23

## OTHER AUTHORITIES

Contracts, § 7.11 (2d ed. 1998) ..................................................................... 26

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
-iv-
CASE NO. CV 08-04263 CAS (FMOx)

# I.     **INTRODUCTION**

Based on nothing more than brief ad campaigns that did not yield as many new customers as they had hoped, Plaintiffs, Menagerie Productions ("Menagerie") and Redwolf, LLC ("Redwolf"), sued Citysearch, LLC and its parent company, IAC/InterActiveCorp (together, "Citysearch"), claiming that Citysearch had done nothing to protect them from "click fraud"—*i.e.*, malicious clicks made on their ads by third parties seeking financial gain. That allegation was proven false: Discovery demonstrated that Citysearch goes to great lengths to minimize the incidence of fraudulent or otherwise invalid clicks, and Plaintiffs' expert has conceded he has no evidence that Plaintiffs or any other advertisers were ever in fact charged for an invalid click. Their initial theory discredited, Plaintiffs then offered up several other far-fetched theories, each of which also fell flat on the record and has been abandoned on this motion.[1]

Now, grasping for some theory that might be addressed on a classwide basis, Plaintiffs have asked the Court to approve and impose an uncharted and unprecedented process for redefining what is a "valid" click, in order to attempt to prove whether any allegedly invalid clicks actually have been charged for. According to Plaintiffs, the Court (or the jury) would first somehow create, in the abstract, categories of "objectively invalid" clicks. To take two of a perhaps infinite number of examples, the fact finder would somehow decide whether six clicks made within 40 seconds is evidence of an engaged consumer or of click fraud, or whether a click from Japan is potentially valuable to a restaurant in New York. *See* Report of Bernard J. Jansen ("Jansen Rep."), Kabatek Ex. 27 at 14

---

[1] Plaintiffs' motion thus makes no reference to their allegations that Citysearch's commission structure caused its salespersons to click on their own customers' ads, that Citysearch used an automated program (the so-called "Spike department") to generate artificial clicks, or that Citysearch knowingly charged for clicks it knew to be invalid. *See* Second Amended Complaint ("SAC"), ¶¶ 31-32, 53, 58-60; Declaration of Guinevere Jobson, Exs. D at 8-9 and E at 7-8. All declarations submitted on this motion will be cited as "[Declarant], ¶ __ Ex. __ ."

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   (determination of click validity implicates "thousands of possible attributes,

2   hundreds of filters, and dozens of rule sets").  After many potential characteristics

3   of invalid clicks have been categorized, someone—though not Plaintiffs' expert

4   (who was not asked to do so, has never done so, and admits he does not know

5   where to start)—would then write a software algorithm based upon those

6   parameters.  This hypothetical algorithm would then process several years' worth of

7   click data for more than 75,000 advertisers to determine whether any clicks that

8   failed to pass algorithmic muster had actually been charged to advertisers.

9        Plaintiffs' request is quite remarkable.  They have adduced no actual

10   evidence of wrongdoing, let alone wrongdoing on a classwide basis.  Their expert

11   has not even advanced a *theory* as to why Citysearch is even *likely* to have charged

12   for a particular type of invalid click.  Yet Plaintiffs now float a grandiose proposal

13   that, while perhaps fit for a doctoral dissertation, has no place in class action

14   litigation and cannot satisfy Rule 23.  A class may be certified only upon

15   submission of evidence demonstrating a generally applicable course of conduct that

16   would support a finding of liability—not in order to test a hypothesis for finding

17   some yet unidentified wrongdoing.  Put another way, Plaintiffs are not asking this

18   Court to determine liability and damages in this matter; they are asking the Court to

19   convene under its auspices an administrative rulemaking that might—or might

20   not—result in identifying some metric of Citysearch's click analytics to which

21   Plaintiffs might object.  Setting aside the serious constitutional issues presented by

22   such an approach, Rule 23 simply cannot be stretched this far.  For one thing, the

23   Court could not fairly impose retroactive liability on the basis of a litigation-derived

24   algorithm because no single algorithm could appropriately determine what was

25   "objectively reasonable" with respect to each click, and each advertiser, and each

26   time over a five-year period of rapid evolution in both permutations of click

27   conduct on the Internet, and knowledge about that conduct.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    When Plaintiffs' theoretical flights of fancy are brought to ground and the

2   actual evidence is analyzed under Rule 23, it quickly becomes clear that this case is

3   not amenable to class treatment.  Neither Plaintiff is typical of the putative class,

4   having neither read nor relied upon any common alleged misrepresentation.  Nor

5   are they adequate class representatives:  Plaintiffs have not suffered any injury of

6   the type alleged in the complaint and, as former advertisers, they lack standing to

7   obtain the injunctive relief they request.  Moreover, there is simply no way to

8   adjudicate classwide liability on the basis of Plaintiffs' idiosyncratic experiences

9   with Citysearch.  A trial to determine liability would require an individualized

10  inquiry into each of Citysearch's 75,000 current and former advertisers'

11  understandings and expectations as well as their click, billing, and refund histories.

12    Under these circumstances, the Court should deny Plaintiffs' motion.

## II.    FACTUAL BACKGROUND

### A.    Citysearch and Its Pay-per-Click Advertising Model

15    Citysearch.com is a free, online guide for listings of businesses—including

16  restaurants, retail stores, and professional services—throughout the United States.

17  Business listings may include, among other things, business contact information,

18  user ratings, and reviews.  Businesses that wish to increase their exposure can pay

19  to have created and displayed on the Citysearch website a business profile page

20  where they can provide users with more detailed information about their business.

21  Advertisers who select Citysearch's "PPC ['pay-per-click'] package" pay a flat

22  monthly fee for a business profile plus a fee for each click within the profile up to

23  the advertiser's chosen monthly budget (the "CAP").  Since 2005, Citysearch has

24  also offered businesses the option to advertise on its distribution partners' websites

25  through its "syndication" program.  Asher, ¶ 2.

26    PPC advertising is a well-known Internet business model.  Kabateck, Ex. A

27  at 7.  From the advertisers' perspective, a primary benefit of PPC advertising is that

28  it enables them to gauge with relative ease and precision their return on investment

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   ("ROI"). Rhoden, ¶ 3. Unlike Internet "display" ads, for which advertisers pay a

2   fee for every 1,000 impressions (*i.e.*, appearances of the ad on a webpage viewed

3   by a user), PPC ads result in charges to the advertiser only if they are clicked on.

4   As a result, an advertiser can more readily determine whether its ad is attracting

5   potential customers and modify the campaign accordingly. *Id.*

6         While the PPC model offers advertisers significant advantages, it comes with

7   one well-known caveat: there is no guarantee that every click on an ad signifies

8   engagement by a person potentially interested in doing business with the

9   advertiser—or even by a human user. This is so because, as Plaintiffs acknowledge

10  (Plfs' Mem. in Supp. of Mot. for Class Cert. ("Mem"), at 23), there is no way for a

11  website operator like Citysearch to determine with certainty the subjective intent

12  behind any given click on an ad—*i.e.*, whether the click was made by an interested

13  consumer, a competitor doing research, a robot ("bot") or similar automated

14  computer program, a plaintiff's attorney looking for a class representative, and so

15  on. Rhoden, ¶¶ 3, 12. And while reputable companies like Citysearch strive to

16  identify and avoid charging for clicks emanating from plainly automated devices

17  such as bots and "spiders," the methods by which fraud can be accomplished are

18  many and ever-changing. The existence of so-called "click fraud," then, is a well-

19  known, industry-wide issue for which there is no single or simple answer. Rhoden,

20  ¶¶ 2, 4. It is a risk inherent in the PPC model itself and, as both Plaintiffs' expert

21  and Redwolf acknowledge, a risk borne by the advertiser. Jansen Depo. at 159:1-

22  16; Redwolf Depo. at 59:9-14.[2]

23        **B.    Citysearch Does Not Guarantee the Validity or Quality of Clicks**

24        Because it cannot guarantee that all clicks charged to an advertiser are made

25  by potential customers of the advertiser, Citysearch specifically "disclaims any and

26  all express or implied warranties . . . [including as to] the quality or timing of click-

27  _____

28  [2] Excerpts from the Menagerie, Redwolf, and Jansen deposition transcripts are
    attached as Exhibits A, B and C, respectively, to the Jobson Declaration.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  throughs, click-through rates, conversions [meaning the extent to which clicks

2  result in actual business for the advertiser], or other performance or results for any

3  advertising. Asher, Ex. D § 10. Further, Section 3 of Citysearch's Terms and

4  Conditions (the "Terms") states:

5        Business shall pay . . . the cost per click . . . for each Click-

6        Through . . . up to the Budget set forth on the Enrollment Form.

7        "Click-Throughs" are defined as (i) clicks on Business's advertising

8        located on the Citysearch website or a Citysearch distribution partner

9        website . . . (ii) clicks directing users to Citysearch partner web pages

10        containing Business' enhanced content . . . [or] (iii) clicks on certain

11        content links located on Business' Citysearch profile page, or on a

12        Citysearch distribution partner web page. *Id*. at § 3a.

13        In the face of this clear language, Plaintiffs have not adduced any evidence to

14  support their argument that Citysearch may charge only for clicks by "potential

15  clients" of the advertiser. *See* November 4, 2008 Order, at 6 (Jobson, Ex. F).[3] Nor

16  have they identified any representation Citysearch allegedly made to them about

17  click validity or click fraud detection that was false or misleading in any way.

18  Redwolf Depo. at 175:10-17; 192:2-23. Indeed, Plaintiffs do not even reference

19  any of the materials cited in their complaint, including the "About Us" and "FAQ"

20  pages, and Citysearch's Invalid Click Policy (the "Policy") which is published on

21  the citysearch.com website. The reason is plain enough: None of these materials

22  makes any guarantees about click validity, click fraud detection or ROI, and neither

23  Plaintiff claims to have been misled by them in any event. The Policy, for example,

24  specifically warns advertisers that Citysearch "cannot ensure that all invalid clicks

25  will be detected." SAC, Ex. D.

26  _____

27  [3] The Court denied Citysearch's motion to dismiss Plaintiffs' contract claim based on Plaintiffs' representation that extrinsic evidence would show that the Terms could be susceptible to two differing interpretations. *Id*. at 7-8. Since then,

28  Plaintiffs have offered no evidence, much less classwide evidence, to that effect.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Instead, Plaintiffs merely cite two internal Citysearch documents produced in

2   discovery to support their claim that false representations were made to

3   (unidentified) class members.  Kabateck, Exs. 11, 9.  The first refers to a "fraud

4   prevention guarantee," the second states that Citysearch monitors traffic from its

5   distribution partners for click fraud.  But these documents were never shared with

6   any advertiser.  Asher, ¶ 15.  Nor did they serve as a uniform script for telephone

7   sales—no script was ever used.  *Id.*  Indeed, Plaintiffs admitted they had never seen

8   either document nor heard any of the representations therein.  Menagerie Depo. at

9   71:14-21; Redwolf Depo. at 115:24-116:5; Jobson, Ex. D at 11-12; E at 11-12.

10   **C.  Citysearch Employs Numerous Click Fraud Detection Methods**

11   Although Citysearch is not contractually obligated to do so, it takes a number

12   of affirmative steps to reduce the incidence of click fraud.  Since 2004, Citysearch

13   has used sophisticated computer programs to filter out clicks deemed "invalid" and

14   not chargeable to the advertiser.  Rhoden, ¶¶ 7-11.



FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

3

4

5



6   Plaintiffs do not dispute Citysearch has employed these click-fraud detection

7  procedures; nor do they argue that these procedures are inadequate in any way.

8  Jansen Depo. at 107:19-112:8.  Nor have they offered any evidence that Citysearch

9  has failed to detect and prevent advertisers from being charged for fraudulent

10  clicks, or even any of their as-yet-unidentified "objectively invalid" clicks.

11

12

13

14

15

16

17

18

19

20

21

22

23

24



25

---

26  [4] This automated filtration process excludes clicks in two steps:  in real time, as the clicks occur, and at the end of each day.  This two-step process is necessary because certain types of clicks cannot be identified as "invalid" unless they are analyzed in relation to other clicks.  Rhoden, ¶¶ 9-12.

27

28  [5] *See* Asher, ¶ 12 n.3.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**D.    Advertisers' Experiences with Citysearch**

Menagerie, Redwolf, and former plaintiff Tom Lambotte are all former Citysearch.com advertisers.  Other than that, they have little in common.  As their experiences show, there is no typical Citysearch.com advertiser experience.  Rather, each advertiser's expectations of and experience with Citysearch is unique.

1.    Advertisers Enroll in the PPC Program in a Variety of Ways

Many advertisers enroll in Citysearch's PPC program by telephone, as Plaintiffs Redwolf and Menagerie did.  Asher, ¶ 17.  In general, the advertiser speaks with at least one Citysearch account representative, completes an enrollment form over the phone, and indicates its consent to the Terms.  *Id.*  Citysearch's account representatives do not follow any standardized script for these calls; rather, they are trained to interact with each advertiser in an individualized way.  Asher, ¶ 16-17.  And, while Citysearch records the advertiser's consent, this does not mean that the advertiser actually read the Terms.  *Id.*  For example, while both Plaintiffs verbally consented to the Terms, we now know that neither had actually read them.  Redwolf read information contained on the "Advertise with Us" and "About Us" pages of Citysearch's website, but not the Terms, the Policy, or the "FAQ" page.  Jobson, Ex. E at 11-12; Redwolf Depo. at 111:9-112:24; 115:24-116:2; 122:7-13; 153:6-154:10; 192:2-23.  Menagerie read none of these documents.  Jobson, Ex. D at 11-12; Menagerie Depo. at 65:3-17; 76:22-77:10; 82:4-8.

About 20 percent of businesses enroll online through an automated process on Citysearch's website.  Asher, ¶ 18.  These businesses must state that they agree to an online version of the Terms.  However, as with telephone enrollees, there is no way for Citysearch to know whether any advertiser has actually read the Terms or any materials on Citysearch.com.  Advertisers may, but are not required to speak with an account representative before enrolling.  Some, like former plaintiff Tom Lambotte, simply enroll online without ever speaking to anyone at Citysearch.  *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   A small group of advertisers, usually larger businesses, negotiate contracts

2   individually with Citysearch and thus are not subject to the Terms. Lastly, some

3   advertisers have no contractual relationship with Citysearch, but rather pay

4   advertising agencies to manage their Citysearch ads. Asher, ¶ 19.

5           2.      Key Terms of the Contracts Are Unique to the Advertiser

6   Not surprisingly, different advertisers have different budgets and needs and

7   so the enrollment forms executed by advertisers contain numerous terms that are

8   individual to the advertiser. These include the category and geographic market into

9   which the ads will be placed, the length of the ad campaign, the cost per click, and

10  the monthly advertising budget. Asher, ¶ 20. For example, Redwolf contracted to

11  have its ad placed in the "Business Services--Payroll Services" category in the

12  Charlotte market for a minimum of six months, and to pay 30 cents per click up to a

13  monthly budget of $200. *Id.*, Ex. E. Menagerie contracted for the "Spa & Beauty:

14  Beauty Salons" category in the Portland market for a minimum of three months,

15  and to pay $1 per click up to a monthly budget of $1,000. *Id.*, Ex. F.

16          3.      Advertisers' Expectations Vary

17  Advertisers do not read all the information Citysearch provides about its

18  service, and, even when they do, may interpret it differently. The expectations of

19  each advertiser vary depending on its sophistication, its use of other PPC programs,

20  and what the advertiser may or may not have read or heard. Menagerie admitted

21  that it: (1) never saw or relied on any of the alleged misrepresentations made by

22  Citysearch; (2) had no expectations regarding click-fraud detection; and (3)

23  understood that it was contractually obligated to pay for clicks even if not from

24  potential customers. Menagerie Depo. at 65:3-17; 76:22-77:10; 102:4-103:1;

25  78:21-79:10. Menagerie cancelled its ad campaign based upon its incorrect belief

26  that it would be charged only if users who viewed its profile clicked on a link

27  within the profile to *contact* Menagerie by email. *Id.* at 68:4-69:13.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Redwolf admitted that it:  (1) understood, based on prior experience with PPC advertising there was a risk that not all clicks on its ad would be from potential customers; (2) believed that it was contractually obligated to pay for clicks that were not from potential customers; (3) had no expectations regarding detection of fraudulent clicks or the performance of its ad; and (4) did not hear or read any statements by Citysearch that it now believes were false or misleading.  Redwolf Depo. at 30:14-18; 46:10-17; 47:2-23; 59:9-14; 86:7-15; 107:1-109:21; 116:3-9; 133:4-134:6; 135:2-11; 140:16-24; 175:10-17; 185:18-186:5.  Redwolf cancelled its ad campaign based on its belief that not enough users were clicking on a link within its *profile* to direct them to Redwolf's *own website*.  *Id*. at 135:2-137:12 & Ex. 15.

### 4.   Ad Content and ROI Vary

Citysearch explains to advertisers that the quality and content of their ads—specifically their profile page—can greatly impact the effectiveness and ROI of the advertising.  Asher, ¶ 7.  For example, Citysearch repeatedly encouraged Menagerie to add more content—including photos and user reviews—after it complained about the performance of its ad.  Menagerie Depo. at 82:19-84:25; Ex. 6; Asher, ¶ 7.  However, beyond posting two "fake" user reviews, Menagerie did nothing to enhance its profile.  *Id*. at 82:19-84:25.  Redwolf likewise did nothing to enhance its profile.  Redwolf Depo. at 142:15-144:16; 147:10-147:17.

The category into which an ad is placed can also impact its performance.  Asher, ¶ 8.  For example, an ad that cannot be placed into an established category, like "Sushi Restaurant," may not perform as well because users cannot search for or find what they are looking for as easily.  This was a problem faced by Menagerie.  Because there was no existing category for its "makeup artistry" service, Menagerie was placed into the closest available category, "Beauty Salons: Spa and Beauty."  Menagerie later complained that this placement contributed to poor ad performance and requested to be switched to the category of "Cosmetics."  *Id*.; Menagerie Depo. at 92:20-95:22; Asher, ¶ 8.  Similarly, an ad that is placed in the *wrong* category is

1   unlikely to perform well.  This is what happened with Redwolf, which inadvertently

2   was placed into both "Medical Billing" and "Payroll Services" when it should have

3   been (and later was) placed only into the latter.  Asher, ¶ 8.

4       Plaintiffs' apparent lack of success in advertising with Citysearch is far from

5   typical.  By contrast, most Citysearch advertisers have reported great satisfaction

6   with their ad campaigns, and 90 percent have extended or renewed them, rather

7   than canceling early as Plaintiffs did.  Asher, ¶ 12 & Exs. A-C.

8                5.    Some Advertisers Obtain Refunds/Chargebacks

9       In the ordinary course, advertisers request and receive refunds for many

10  reasons, including low click quality.  Asher, ¶ 21.  Citysearch does not track

11  refunds attributable to quality as a separate category of refunds, however.  Instead,

12  such refunds might be logged in general categories like billing errors, click spikes,

13  and customer expectations.  *Id*.  Refunds ██████████████████████████████

14  ████ are recorded in dollars, not clicks.  *Id*. at n8.  Accordingly, where an

15  advertiser received a refund, it is not possible for Citysearch to discern which

16  specific clicks the advertiser paid for, which were refunded, and for what reasons.

17  *Id*. at ¶¶ 21, 24.  In fact, because many refunds are given based not on the actual

18  cost of a click but rather to make or keep the customer happy, the amount of a

19  refund often exceeds the value of any specific clicks complained about.  *Id*. at ¶ 24.

20      This experience is illustrated by Plaintiffs, each of whom obtained a

21  significant refund.  Menagerie obtained a credit of $350 after expressing

22  dissatisfaction with ad performance and confusion about what it would be charged

23  for.  Asher, ¶ 22 & Ex. G.  Redwolf obtained a credit of $75 for having its ad

24  placed in the wrong category, as well as a chargeback of all but $53.75.  Redwolf

25  Depo. at 170:2-15; 187:3-188:10.  He thus received over 1,000 clicks for free,

26  paying for less than 80 that were billed.  *Id*. at ¶ 22 & Ex. H.  Former plaintiff

27  Lambotte's credit card was charged $69.95 for all of the clicks on his ad, but this

28  amount was reversed in its entirety before this lawsuit was filed.  *Id*. at ¶ 22.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### E.   Plaintiffs Submit No Evidence That They or Any Other Class Members Were Charged for Invalid Clicks

Setting aside the problem of determining what exactly constitutes an "invalid click," Plaintiffs supply no evidence that they or any other Citysearch.com advertiser was charged for such a click.  Both Plaintiffs' principals admitted in their depositions that they had no evidence they were charged for invalid clicks. Menagerie Depo. at 197:9-11;184:6-20; Redwolf Depo. at 176:25-178:5.  Plaintiffs' expert, Bernard Jansen, who reviewed the log data showing the source of the clicks on Plaintiffs' ads, was similarly unable to draw such a conclusion.  While Mr. Jansen testified that such log data would be sufficient to determine whether any click, for any class member, is "valid or not," he <u>was unable to identify even a single click that he could conclude, even preliminarily, was improperly charged to Plaintiffs</u>.  Jansen Rep. at 1, 15-16; Jansen Depo. at 46:5-8; 237:1-24.

The most Mr. Jansen could say was that the click logs appeared to reflect a handful of so-called "doubleclicks" that he preliminarily concluded should be deemed "invalid."[6]  But he also admitted that these instances of multiple clicks—which had *not* yet been processed through Citysearch's end-of-day filters—were precisely the types of clicks he would expect to see on a *pre-filter* click log, which is what he reviewed.  Jansen Depo. at 48:5-23; Rhoden, ¶ 11 n2.  It thus comes as no surprise that Plaintiffs have absolutely nothing to say about these click logs in their moving papers.  Indeed, they cite *no evidence* in support of their assertion that

---

[6] Mr. Jansen initially claimed click invalidity to be based on certain "industry standards" that he later admitted were nothing of the sort, but rather a mere wish list promulgated by advertisers. Jansen Rep. at 15; Jansen Depo. at 53:20-55:6; *see also* Tuzhilin Report at 11-14 (attached as Exhibit I to the Jobson Declaration).  He ultimately conceded at deposition that each supposed industry "standard" depended upon subjective parameters that were not standardized and had to be individually applied to each situation. Jansen Depo. at 53:20-24 (no industry standard for evaluating doubleclicks); 86:14-94:8 (no industry standard for evaluating repeat clicks); 97:15-23 and 102:25- 103:12 (no industry standard for determining which IP addresses, domains and referral sites should be blocked); 129:11-134:15 (no industry standard practice for dealing with statistical deviations).

they (and other Citysearch.com advertisers) were charged for clicks they should not have been, much less a common practice of same. Mem. at 11:5-7.

### F.   Citysearch Does Not Maintain the Click Data Necessary for Plaintiffs' Proposed "Analysis"

Lacking any evidence of click fraud, Plaintiffs propose an amorphous process whereby an as yet unwritten algorithm would be used to "analyze" click data to determine what is and is not a valid click (by reference to categories that have yet to be delineated). Even assuming such an algorithm could be devised, the data that Citysearch retains are insufficient to perform the proposed analysis.

Citysearch maintains certain click data in a number of different systems. Its "Panorama" and "MyAccount" sales management systems retain summary data, namely, the total number of clicks per account per day. These systems cannot be used to determine whether any particular click was valid or not as they do not contain any information about individual clicks, such as information about their timing or origin. Rhoden, ¶ 24, Ex. H. While Citysearch also maintains click logs—which Plaintiffs misleadingly dub the "central click database" —the data collected about each click are inconsistent over time, much of the data is stored in back-up format, and data prior to August 2005 no longer exist. Rhoden, ¶ 20-23.[7]

More fundamentally, there is no way to reconcile any particular click with what was *charged* to an advertiser. Citysearch charges advertisers based upon end-of-day total clicks, not individual clicks. Citysearch does not even charge customers for all valid clicks due to its "Lost-to-CAP" policy. Rhoden, ¶¶ 25-26.

███████████████████████████████████████████

---

[7] Plaintiffs' expert did *not* address these databases in his report, which proposed a method he claimed could work only "*if* the data concerning the click is available." Kabateck, Ex. 27 at 3 (emphasis added); *see also* Jansen Depo. at 234:20-235:16.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

3

4

5

6

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7   Plaintiffs also do not address other major hurdles to the viability of their

8   algorithm, such as:  advertisers' ability to vary their daily budgets (which affects

9   Lost-to-CAP); varying CPCs over the course of an advertiser's tenure with

10   Citysearch; and whether refunds were issued.  Rhoden, ¶ 25-27; Asher, ¶ 5 n1.

11   ## III.   LEGAL STANDARDS

12   Plaintiffs acknowledge that they bear the burden of satisfying all four

13   requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy)

14   plus the requirements of Rule 23(b)(3) (predominance and superiority).  *Hanon v.*

15   *Dataproducts Corp.*, 976 F.2d 497, 508-09 (9th Cir. 1992); *Burkhalter Travel*

16   *Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 152 (N.D. Cal. 1991).  Plaintiffs'

17   attempt to meet their burden with speculation and hypotheses is plainly insufficient.

18   A class may be certified only if, after a "rigorous analysis" of the relevant

19   facts and issues, the Court is satisfied that the requirements of Rule 23 have been

20   satisfied.  *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 235 (C.D. Cal. 2007); *see*

21   *also Amchem Prods. v. Windsor*, 521 U.S. 591, 620-23 (1997) (analysis requires

22   much more than a "certify now, worry later approach").  The analysis requires

23   careful examination of all evidence that is relevant to certification, both factual and

24   expert.  *See Kelley v. Microsoft*, 251 F.R.D. 544, 554 (W.D. Wash. 2008); *Hanon*,

25   976 F.2d at 509.  Plaintiffs must therefore provide *evidence* that shows the

26   requirements of Rule 23 have been met, and may not simply rely on unsupported

27   allegations of wrongdoing.  *See Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d

28

1  1304, 1308-09 (9th Cir. 1977); *In re Paxil Litig.*, 212 F.R.D. 539, 543 (C.D. Cal.

2  2003); *Rodriguez v. Gates,* 2002 WL 1162675, *3 (C.D. Cal. May 30, 2002).

3       Plaintiffs' suggestion that the Court must eschew any reference to the merits

4  of the case is incorrect. "Courts are not only at liberty to but must consider

5  evidence which goes to the requirements of Rule 23 [] even [if] the evidence may

6  also relate to the underlying merits of the case." *Bishop v. Petro-Chemical Trans.,*

7  *LLC*, 582 F. Supp. 2d 1290, 1305 (E.D. Cal. 2008) (quoting *Dukes v. Wal-Mart,*

8  *Inc.*, 509 F.3d 1168, 1178 (9th Cir. 2007)). *See also Kelley*, 251 F.R.D. at 554.

9  Indeed, because issues such as adequacy, typicality and predominance must be

10  analyzed in light of the plaintiffs' legal theories and factual allegations, the overlap

11  of merits and class proof is often inevitable. *See, e.g., Hanon*, 976 F.2d at 508-09.

12  **IV.  <u>PLAINTIFFS DO NOT SATISFY THE TYPICALITY REQUIREMENT</u>**

13       As Plaintiffs concede, typicality requires that the "class representatives'

14  claims *arise from the same or similar* injury, *based on conduct that is not unique to*

15  *the named plaintiffs,* and when the *proposed class members have been injured by*

16  *the same or similar course of conduct.*  Mem. at 10 (emphasis added) (*citing*

17  *Hanon*, 976 F.2d at 508); *see also Dukes*, 474 F.3d at 1232.  The purpose of these

18  requirements is to ensure the named plaintiffs will pursue the same ends as the

19  unnamed class members. *See O'Connor v. Boeing North American*, 197 F.R.D.

20  404, 416 (C.D. Cal. 2000) ("'The premise of the typicality requirement is simply

21  stated:  as goes the claim of the named plaintiff, so go the claims of the class'. . .

22  Where the premise does not hold true, the class treatment is inappropriate").

23  Where, as here, "the substantive claims depend on individual permutations . . . the

24  claims of the named plaintiffs who have the same general complaint against the

25  defendant as the class are not typical." *Gartin v. S&M Nutec LLC*, 245 F.R.D. 429,

26  434 (C.D. Cal. 2007) (quotations omitted).

27       In this case, Plaintiffs have not identified *any* actionable injury they have

28  suffered, much less a similar one suffered by the rest of the class.  This is because

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  Plaintiffs have not offered any evidence that they were charged for invalid clicks,

2  but have merely advanced a theory that they and other class members *want to*

3  *explore* whether they have been charged for some as-yet-unidentified categories of

4  "objectively invalid" clicks.[8] Thus, there is nothing before the Court that would

5  permit it to even speculate, much less conclude, that these Plaintiffs paid for (and

6  thus were injured by) objectively invalid clicks, whatever they might be.

7      If the injury suffered by the class is presumed to be what was actually pled—

8  being charged for fraudulent clicks—Plaintiffs have certainly not shown they

9  suffered this injury. Plaintiffs' own expert analyzed their click logs and did not

10 find a single click that appeared to be fraudulent. Jansen Depo. at 46:5-8. This

11 defeats typicality. *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (named

12 plaintiff must demonstrate actual injury to itself, not potential injury to others);

13 *Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 622 (S.D. Cal. 2007)

14 (typicality where class members injured by conduct that did not injure plaintiff).

15     Plaintiffs' depositions confirm that their real grievance is not that they were

16 charged for invalid clicks at all, but that they received a poor return on their

17 investment—a wholly different injury that defeats typicality. *See Gen. Tel. Co. of*

18 *Southwest v. Falcon*, 457 U.S. 147, 157-58 (1982); *Akkerman v. Mecta Corp., Inc.*,

19 152 Cal. App. 4th 1094, 1101 (2007) (typicaly not met where class representative's

20 injury was based on malpractice, not reliance on allegedly deceptive statement).[9]

---

21  [8] This theory is not set forth in the SAC, which alleges that Citysearch failed to take
22  any steps to combat click fraud. The fact that Plaintiffs' new theory of liability was
    not pled in the complaint is reason alone to deny the motion. *See Lozano v. AT&T*
23  *Wireless Servs., Inc.*, 504 F.3d 718, 730 (9th Cir. 2007) (reversing certification of a
    class based on theory not pled in complaint).
24  [9] "Poor ROI" does not give rise to a claim, particularly where Citysearch's Terms
    disclaim any specific results. But even if it did (and had been pled), any such injury
25  would be wholly inappropriate for class treatment. The value of the advertising
    Plaintiffs received could never be typical of the value received by the other
26  members of the putative class. As shown above, the value an advertiser expects
    and receives from Citysearch's PPC advertising depends on highly individualized
27  factors such as the representations that were made to it; whether it purchased
    directly or through an agency; the content and maintenance of its advertising; the
28  category into which its ad is placed; and the duration of its ad campaign.

1    Even if Plaintiffs could show actual (as opposed to hypothetical) injury, they

2    still cannot establish typicality because there is no evidence they read and relied

3    upon a misrepresentation made to all class members.  Although they assert (without

4    citation) they received the same allegedly deceptive statements as other class

5    members (Mem. at 11), the evidence proves otherwise.  Menagerie relied solely on

6    verbal representations and read no documents.  Redwolf relied on a combination of

7    verbal and written representations (all of which he admitted were *true*[10]) but did not

8    read the Terms, the Policy or the FAQ page.  And neither had heard about any

9    purported "fraud guarantee."  *See* pp. 8-9, *supra*.  Yet according to the SAC (¶¶ 19-

10   23) and this motion, other class members read and heard these materials in forming

11   their expectations about Citysearch's PPC service.  Mem. at 4-5, 13-14.  Under

12   these circumstances, Plaintiffs' claims are *atypical* of the class: "Because the class,

13   as defined by the plaintiffs, potentially includes class members who received

14   [representations] other than those received by the named plaintiffs, the class

15   definition is broad and overinclusive.  *Scott v. Mascott*, 1999 WL 33117204, *1

16   (W.D. Wash. Apr. 13, 1999); *see also Akkerman*, 152 Cal. App. 4th at 1100-01;

17   *Caro v. Proctor & Gamble Co.*, 18 Cal. App. 4th 644, 653 (1993) (plaintiff who was

18   not misled in same manner as class members was atypical).

19   **V.    PLAINTIFFS DO NOT SATISFY THE ADEQUACY REQUIREMENT**

20   To be adequate class representatives, the named plaintiffs must show their

21   interests are aligned with those of absent class members.  *Gartin*, 245 F.R.D at 433

22   (C.D. Cal. 2007); *Hodes v. Van's International Foods, et al.*, 2009 WL 2424214

23   (C.D. Cal. July 23, 2009).  A plaintiff who lacks standing to pursue his own claims

24   obviously does not meet that test.  *Rodriguez v. Gates*, 2002 WL 1162675, *3 (C.D.

25   Cal. May 30, 2002); *Leirboe v. State Farm Mut. Auto Ins. Co.*, 350 F.3d 1018, 1022

26   (9th Cir. 2003); *Multi-Ethnic Immigrant Workers Organizing Network v. Los*

27

28   [10] Redwolf Depo. at 107:1-109:17; 175:10-17.
DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS            -17-            CASE NO. CV 08-04263 CAS (FMOx)
CERTIFICATION

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   *Angeles*, 246 F.R.D. 621, 625 (C.D. Cal. 2007.  Plaintiffs are not adequate

2   representatives because they lack standing to pursue all of the claims for relief set

3   forth in their SAC and because they have interests inimical to many class members.

4       All Plaintiffs' claims require a showing of injury.  Damages are an element

5   of both breach of contract and implied covenant claims.  To have standing to assert

6   an Unfair Competition Law ("UCL") claim, a named plaintiff must have suffered

7   injury "as a result of" the defendant's deceptive conduct.  *In Re Tobacco II*, 46

8   Cal. 4th 298 (2009); Cal. Bus. & Prof. Code § 172000 *et. seq.*  But as explained

9   above, Plaintiffs have failed to demonstrate they paid even a single cent for an

10  invalid click.  Consequently, neither Plaintiff can serve as a class representative.

11      In addition, because Plaintiffs are no longer current Citysearch advertisers,

12  they cannot seek injunctive relief under the UCL.  This Court has previously

13  determined that a "plaintiff lacks standing to seek prospective relief under the UCL

14  [where] it appears that he is no longer a customer of Citysearch and it does not

15  appear that he seeks to advertise on Citysearch in the future." Jobson, Ex. H

16  (July 31, 2008 Order at 9).  Both Redwolf and Menagerie admitted they are no

17  longer advertising with Citysearch.  Menagerie Depo. at 41:15-22;  Redwolf Depo.

18  at 151:3-7.  Thus, each lacks standing to seek prospective relief on behalf of the

19  class.

20      Even if they could seek injunctive relief, they have no incentive to do so, as

21  both Plaintiffs stated they have no intention of ever advertising on Citysearch again.

22  Menagerie Depo. at 41:15-22; Redwolf Depo. at 151:3-7.  Their interests therefore

23  do not align with those of absent class members.  *See Amchem*, 521 U.S. at 611

24  (named plaintiffs not adequate where their goal was immediate payment instead of

25  ensuring ample fund for future).  Here, due to the breadth of the proposed class

26  (covering all who have paid for PPC advertising with Citysearch), over 10,000

27  putative class members are currently advertising on Citysearch, many of whom,

28  particularly newer ones, will have more interest in prospective relief than damages.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## VI.   **INDIVIDUAL ISSUES OVERWHELMINGLY PREDOMINATE**

Rule 23's predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Plaintiffs must show that "common issues constitute such a significant aspect of the action that 'there is a clear justification for handling the dispute on a representative basis rather than on an individual basis.'" *Id.* (citation omitted). Even when there are a number of classwide issues to be litigated, if a "great deal of individualized proof" will still be required, the predominance requirement is not met. *Edwards v. First Am. Corp.*, 251 F.R.D. 454, 458 (2008); *see also Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001). As this Court has explained, the "crucial question" is whether Plaintiffs demonstrate the existence of *plausible, classwide* methods for *proving both* liability and damages. *Negrete v. Allianz Life Ins. Co.*, 238 F.R.D. 482, 489 (C.D. Cal. 2006) (Snyder, J.). It is not enough to allege that evidence of common issues "may be available." *Stern v. AT&T Mobility Corp.*, 2008 W.L. 4382796, *8-10 (C.D. Cal. Aug. 22, 2009) (Snyder, J.) (no predominance where plaintiff proffered no evidence supporting allegation of wrongful company-wide practice of billing for services customers did not request). Plaintiffs have not even come close to satisfying their burden here.

### A.   **Plaintiffs Have No Classwide Method of Proving Liability**

While the headings of their legal arguments proclaim they have "classwide evidence" that "will establish" both breach of contract and violations of the UCL by Citysearch (Mem. at 14:7-8; 17:2-3), their brief and supporting declarations contain none. *Indeed, Plaintiffs have not presented a scintilla of evidence whatsoever that Citysearch engaged in any classwide wrongful practice.* Instead, they merely allege in conclusory fashion that Citysearch (1) "made essentially identical representations to all class members regarding its 'invalid' click policy," and (2) "failed to apply" filters to certain (unspecified categories of) "invalid clicks" with

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    respect to "every member of the class." Mem. at 13-14. Neither assertion is

2    supported by the evidence; neither can establish predominance of common issues.

3        The first assertion is demonstrably false: As explained above, Plaintiffs have

4    not identified a single representation that was made *to the two of them, nor one that*

5    *was false, much less one that was made to the entire class. (See supra* at p. 5.)

6        Plaintiffs' second assertion—that Citysearch failed to filter certain types of

7    clicks they have yet to identify—fares no better. Plaintiffs point to a document that

8    they claim proves that Citysearch was not running all of its syndication traffic

9    through all of its automated filters from mid-2005 to July 2007. Citysearch

10   believes its practices in this respect were entirely appropriate (*see* Rhoden, ¶ 18)

11   and that the document cited has been taken out of context. Nevertheless, any

12   alleged failure to apply automatic filters to some syndication traffic between 2005

13   and 2007 would not give rise a classwide liability. Rather, it would affect only

14   those class members who (a) advertised on Citysearch during that period; (b) opted

15   to receive syndication traffic; *and* (c) did not have any questionable traffic excluded

16   by human review. *Id.* This would exclude both Plaintiffs, among tens of

17   thousands of other Citysearch advertisers. And even among affected advertisers,

18   there would still be individual issues as to what filters were applied to their traffic.

19       As a backstop, Plaintiffs essentially argue they do not need to present actual

20   evidence because they *hope to*, if given the chance, demonstrate that Citysearch

21   failed to filter certain as-yet-unidentified categories of clicks. Mem. at 24.

22   Plaintiffs' proposal puts the cart before the horse: Instead of offering evidence of a

23   classwide liability, they have merely hypothesized a methodology for (potentially)

24   *finding* evidence that could theoretically support classwide liability. This cannot

25   possibly satisfy Rule 23.[11] *See Stern*, 2008 WL 4382796, at *10 (evidence that

26

27   [11] Plaintiffs could equally hypothesize that Citysearch added 50% to every
     customer's bill —an allegation that might imply classwide wrongdoing, but could
28   not possibly warrant class certification in the absence of factual support.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   might exist, but "has not been provided" to the Court, "fail[s] to meet [plaintiff's]

2   burden to establish a plausible classwide method" of liability"); *see also Kurihara*

3   *v. Best Buy Co., Inc.*, 2007 WL 2501698 *9 (N.D. Cal. 2007) ("Where a plaintiff

4   fails to 'present sufficient evidence of a classwide practice that gives rise to

5   liability,' class certification is unavailable.") (*citing Cornn v. United Parcel Serv.*,

6   2005 WL 2072091, at *2 (N.D. Cal. Aug. 26, 2005)).

7        Moreover, the evidence finding process proposed by Plaintiffs would not

8   even provide a classwide basis for adjudicating this case. Rather, a host of

9   individual issues would have to be determined at every step. *First*, there is no way

10  to define all of the categories of invalid clicks in purely objective classwide terms.

11  Plaintiffs' own expert defines an "invalid" click as one having "no probability of

12  generating value." Jansen Rep. at 10. This formulation mandates a case-by-case

13  inquiry that is incompatible with classwide treatment since what may have value to

14  one advertiser may be worthless to another. Take the example of IP addresses.

15  One might be tempted to craft a rule stating that clicks from foreign IP addresses

16  are always invalid because they are unlikely to generate value. But that is not true

17  in all cases. A click on a famous New York restaurant by a business traveler in

18  London or Tokyo may well lead to business. Would the same be true for some less

19  famous restaurant that the traveler may have heard of through word of mouth?

20  Perhaps, or perhaps not, but there is no way to automate such a judgment call.

21        Even in the case of "doubleclicks," which Plaintiffs tout as the epitome of

22  invalidity,[12] judgment calls must be made. As Mr. Jansen admits, there is no

23  industry standard for the time period between clicks. Jansen Depo. at 53:20-24;

24  55:3-6. Someone must decide the number of clicks and the time span that will

25  define this category. Are six clicks occurring in the space of 30 seconds within

26

27  [12] Notably, Plaintiffs' own expert believes otherwise. He testified doubleclicks are

28  merely "suspect clicks" which are "not necessarily invalid." Jansen Depo. at 51:22-25 (emphasis added).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

various parts of the business profile evidence of an engaged user or click fraud? What about five clicks over 25 seconds? As Mr. Jansen admits (*id.*), there are no standards within the PPC advertising industry that might answer these questions, and Plaintiffs do not offer any. *See also* Tuzhilin Rep. at 11-14.

*Second*, even if one devised a set of purportedly "objective" rules, they would likely be at once over-inclusive and under-inclusive. An automated algorithm could flag perfectly valid traffic. Mr. Jansen admits that even for clicks that are flagged by a filter, manual review by humans is necessary to determine the significance of anomalies. Jansen Depo. at 218:1-220:7. By the same token, automatic filters can miss larger patterns in the data that suggest fraud—which is why companies like Citysearch supplement their automated systems with human review. Thus, the automated procedures proposed by Plaintiffs would not avoid the need for case-by-case judgments about each advertiser's click data.

*Third*, any set of "objective" invalid-click rules that might make sense today would not be appropriate for application to click data generated years ago. Mr. Jansen admitted that norms and expectations about which clicks should be filtered are constantly evolving. Jansen Rep. at 13. New spiders, robots and "bad" IP addresses that should be added to exclusion lists are identified continuously. Rhoden, ¶ 7. Conversely, as IP addresses are dynamically assigned by service providers, addresses that once were "bad" may later become perfectly acceptable. *Id.* at ¶ 12. What is invalid (or considered invalid) today was not necessarily invalid (or considered invalid) four years ago and thus, what is "objectively reasonable" to filter out today may not have been reasonable to filter in prior years, or prior months. Tuzhilin Rep. at 15-17. The doubleclick, Plaintiffs' favorite example, was not excluded by Google until 2005. Kabateck, Ex. 1 at 31. In essence, the only way to determine whether any given click was "objectively invalid" *at the time it was made and received* would be to evaluate the particular circumstances of that click in light of the then-prevailing industry knowledge, norms, and expectations

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    about particular types of fraudulent or otherwise invalid clicks.  Using today's (or,

2    more accurately, next year's) algorithm to judge last year's click filtering simply

3    does not work.  To ask a factfinder to proscribe, and then to create and run,

4    hundreds if not thousands of algorithms to reflect these evolutions presents a

5    completely unmanageable task.[13]

6        *Fourth*, Plaintiffs' proposal assumes that the data necessary to form their

7    retrospective analysis actually exists.  In fact, the click data pertaining to class

8    members who advertised with Citysearch prior to August 2005 are not available.

9    Rhoden ¶ 21.  Further, the data that do exist are inconsistent, fragmented and

10   unsuitable for the proposed process.  *Id.* at ¶¶ 20-24.  For many advertisers in the

11   putative class, Plaintiffs' proposal would afford no basis for relief whatsoever.

12       *Finally*, the results of any algorithmic process must be measured against what

13   each advertiser actually paid.  Critically, Plaintiffs concede that their proposed

14   algorithm could not determine whether any given invalid click that it detects was

15   actually charged to the advertiser.  Mem. at 25:3-6; Jansen Depo. at 43:2-14. *see*

16   *also* Tuzhilin Rep. at 17-18.  Plaintiffs suggest this is only a damages issue.  Mem.

17   at 1, 25.  It is not.  Without this information, *liability* cannot be determined in the

18   first place, which according to Plaintiffs, is the very purpose of the algorithm.

19       In sum, Plaintiffs' proposed attempt at classwide adjudication falls flat.

20   Their proposed methodology is not only riddled with conceptual flaws and

21   individual issues but is entirely unmanageable.  As a result, Plaintiffs' motion fails

22   not only the predominance requirement but also the superiority prong of Rule

23   23(b)(3)(D), which requires consideration of the "likely difficulties in managing a

24   class action." *See Zinser*, 253 F.3d at 1192 ("[W]hen the complexities of class

25

26   [13] Plaintiffs' assertion that Citysearch is already performing the type of retroactive
     click analysis they are proposing be done here (Mem. at 24) is absurd.  As
27   explained in Mr. Rhoden's declaration, the so-called retroactive analysis that
     Citysearch does analyzes live data of clicks over the past 24 hours, not the past
28   five-plus years of the limitations period. Rhoden, ¶ 12.

1  action treatment outweigh the benefits of considering common issues in one trial,

2  class action treatment is not the 'superior method' of adjudication.").

3  **B.  Plaintiffs Have No Classwide Method Of Proving Damages**

4  Plaintiffs acknowledge that they must present a plausible method for

5  calculating damages on a classwide basis. Mem. at 22; *Allied Orthopedic*

6  *Appliances, Inc. v. Tyco Healthcare Group, L.P.*, 247 F.R.D. 156, 176 (C.D. Cal.

7  2007) ("[I]t is simply not enough that Plaintiffs merely promise to develop in the

8  future some unspecified workable damage formula. A concrete, workable formula

9  must be described before certification is granted.'") (citation omitted). In fact, they

10  informed the Court they intended to retain an expert to address what they called the

11  "central issue" and "hardest part of this case[,] which would be showing . . . class

12  members' damages in some reasonable and accurate way." Jobson, Ex. G at 7.

13  Plaintiffs have presented nothing of the kind. Their expert has offered no

14  method for calculating damages, admitting he was not even asked to. Jansen Depo.

15  at 40:25- 41:9. And Plaintiffs do not argue his hypothetical algorithm could be

16  used to calculate damages. Nor could they, for the reasons described by

17  Citysearch's rebuttal expert in his report. Tuzhilin Rep. at 17-19.

18  Instead, Plaintiffs vaguely assert that each class member's damages could be

19  calculated by comparing the total number of clicks it received on a particular day

20  against the results of Plaintiffs' "click analysis" to determine the number of clicks

21  an advertiser "*should* have been charged" for that particular day Mem. at 25

22  (emphasis in original). Beyond the significant data problems that make this

23  approach unworkable (Rhoden, ¶¶ 20-24), Plaintiffs have presented no real

24  methodology for their proposed calculation. For example, they have not proposed

25  any means of addressing the issue of "invalid" clicks for which refunds may already

26  have been obtained (but as to which there is no one-to-one refund correlation), or

27  the issue of "invalid" clicks for which offsets exist in the form or valid clicks that

28  "should have been charged" to advertisers but were not because they were Lost-to-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    CAP.  Plaintiffs' failure to meet their burden on this critical issue provides an

2    independent basis to deny their motion.  *See Bell Atl. Corp. v. AT&T Corp.*, 339

3    F.3d 294, 306-07 (5th Cir. 2003) (class treatment not suitable where calculation of

4    damages not susceptible to a mathematical or formulaic calculation, "or where the

5    formula proposed to calculate individual damages is clearly inadequate").[14]

6             **C.    Individual Issues Predominate on Each of Plaintiffs' Claims**

7             Beyond the insurmountable obstacles to class certification discussed above,

8    Plaintiffs' causes of action each raises individual issues that defeat predominance.

9                        1.    Breach of Contract Claim

10           Plaintiffs concede that interpretation of the Terms is "[c]entral to the

11   adjudication" of this claim (Mem. at 1), yet their motion never once recites or refers

12   to the contract's language.  Plaintiffs previously argued that only clicks by "users"

13   were chargeable under the contract and offered a contorted interpretation of the

14   term "user" to mean a "potential client" of the advertiser, thereby attempting to

15   overcome the contract's requirement that advertisers pay for "each click," and its

16   express disclaimer of warranty as to click quality.  Jobson, Ex. F at 6.  In response

17   to the Court's skepticism, Plaintiffs represented they would introduce extrinsic

18   evidence to support their interpretation.  *Id.* at 8 (dismissal on pleadings

19   inappropriate because "at oral argument, Plaintiffs stated that they intend to

20   introduce additional extrinsic evidence beyond that which was already submitted to

21

22

23   [14] Plaintiffs' position with respect to Lost-to-CAP clicks also demonstrates that
     their interests are not aligned with many if not most of the absent class members.
24   Because Plaintiffs did not receive any valid clicks for which they were not billed
     due to Citysearch's Lost-to-CAP policy (*see* Rhoden, ¶ 25), they have readily
25   suggested that damages be calculated by subtracting any valid clicks that were
     Lost-to-CAP from the number of invalid clicks identified by their proposed
26   retroactive click analysis to determine the number of clicks by which the advertiser
     was "overcharged."  Mem. at 25.  This proposal, however, would prejudice many
27   class members by reducing and, in many cases, eliminating any possible recovery
     for those who did receive excess valid clicks for free above their CAP

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   support their interpretation").[15]  Plaintiffs, however, have offered no such evidence.

2   And in any event, their purported need to rely on extrinsic evidence, which would

3   vary widely among advertisers, precludes a finding of predominance.

4        That the Terms must be interpreted according to an objective standard, and

5   not an individual advertiser's subjective belief, does not eliminate this issue:

6   Where the relevant representations and facts vary materially from advertiser to

7   advertiser, what is objectively reasonable in one context might not be in another.

8   As Plaintiffs acknowledge, a contract's objectively reasonable meaning can be

9   determined *only* in context.  Mem. at 15 (citing Farnsworth on Contracts, § 7.11, p.

10  291 (2d ed. 1998) (court must determine "what a reasonable person *in the position*

11  *of the adhering party* would think the language meant") (emphasis added)).[16]

12       If, for example, an advertiser was actually told about a purported "fraud

13  guarantee," that fact might support an objectively reasonable interpretation of the

14  contract far different than in the case of another advertiser, who saw or heard only a

15  disclaimer of click quality and the Policy's representation that Citysearch could *not*

16  guarantee it would detect all click fraud.  The range of possibilities is illustrated by

17  Plaintiffs themselves, neither of whom saw or was told anything to support the

18  interpretation of the Terms advanced in their SAC, and both of whom expressly

19  disavowed an interpretation that would have required them to pay only for clicks by

20  potential customers.

21

22  [15] Such extrinsic evidence must first be introduced to show an ambiguity in the
    contract, in the absence of which parol evidence may not be considered at all, and
23  the disclaimer would thus vitiate the contract claim.  *See id.; see also Consol.*
    *World Invs. v. Lido Preferred Ltd.*, 9 Cal. App. 4th 373, 379 (1992).
24  [16] Plaintiffs' reliance on *Peoples v. Sebring Capital Corp.*, 2002 WL 406979 (N.D.
    Ill. March 15, 2002) for the proposition that a court will not consider extrinsic
25  evidence of the intent of each plaintiff in entering a form contract is misplaced.
    Mem. at 15-16.  Individualized inquiries are needed not to assess subjective intent,
26  but rather, to determine objectively reasonable meaning based on individual
    circumstances.  Moreover, the basis for the court's decision in *Peoples* that the
27  individual plaintiffs' intent did not create an individual issue was that neither party
    argued the form contract in that case was ambiguous, a necessary prerequisite to the
28  introduction of such evidence.  *Peoples*, 2002 WL at *8.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Moreover, the element of *breach* of the contract would, under Plaintiffs'

2    interpretation, turn on fundamentally individual issues:  whether an advertiser was

3    charged for clicks by non-"users"—*i.e.*, in Plaintiffs' parlance, clicks by persons

4    not intending to do business with the advertiser.  Determining user intent would

5    pose an individualized, subjective inquiry for every click (*see, e.g.* Rhoden ¶ 12)—

6    indeed, Plaintiffs admit that such user intent *cannot* be determined, much less

7    classwide.  Mem. at 23; Jansen Depo. at 49:23-50:7.

8                    2.    Implied Covenant Claim

9    Plaintiffs' claim for breach of the implied covenant of good faith and fair

10   dealing likewise raises individual issues.  First, since the reach of the covenant is

11   dependent on the contract's express terms, the extent of Citysearch's obligations

12   will vary dramatically based on what each class member saw and heard.  *See*

13   *Carma Dev., Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992).  Second,

14   Plaintiffs have acknowledged that one element of the legal test is whether defendant

15   *subjectively* acted in bad faith—*i.e.*, whether Citysearch knew that clicks it was

16   charging for were fraudulent or invalid.  Mem. at 16.  Yet Plaintiffs' algorithm can

17   make this determination no better than it can determine the subjective intent of an

18   Internet user.  Tuzhilin Rep. at 19.   Third, even if Plaintiffs' theory rested on

19   objective fair dealing alone, an examination of the facts of which Citysearch was

20   aware would remain necessary.[17]  It is only by analyzing the many individual

21   characteristics of clicks that one could possibly determine whether Citysearch

22   "objectively" should have known not to charge for particular clicks.

23

24   [17] For example, Mr. Jansen pointed to six clicks Menagerie received from the same
     user within 32 seconds as "questionable."  Jansen Rep. at 15.  But Mr. Jansen
25   admitted these clicks could have been clicks within multiple pages of Menagerie's
     profile, and thus might indicate the user was a very engaged potential customer,
26   possibly even one of those Menagerie *admitted* it obtained from its ad campaign.
     Jansen Depo. at 48:5-15; Menagerie Depo. at 88:20-89:25.  Indeed, a subsequent
27   investigation of the source of the clicks revealed the user was located at a nearby
     college, further suggesting this user was interested in the youthful style of
28   Menagerie's principal.  *Id.* at 7:22-8:5; 18:4-5; Jobson ¶ 11, Ex. J.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3.   <u>UCL Claim</u>

Plaintiffs' claims under the "unfair" and "fraudulent" prongs of the UCL are premised on a purported "common scheme of failing to apply reasonable methods for filtering out clearly invalid clicks as well as Citysearch's deceptive statements regarding the existence and quality of its click filters." Mem. at 11. Putting aside its utter lack of support, this premise triggers numerous individualized inquiries.

*First*, litigating the "unfairness prong" of the UCL requires individualized analysis of advertisers' expectations. This Court has stated it will apply the "balancing" test to determine whether Citysearch's alleged practice is "unfair" within the meaning of the UCL. Jobson, Ex. H at 11. Under that test, "'the determination of whether a particular business practice is unfair necessarily involves an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *Id.* (*citing Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 n.2 (1980). Critically, the Ninth Circuit has held that, under this test, a plaintiff's *individual expectations* about the practice are relevant to determining the extent of its harm, and thus, depending upon the circumstances, could be a highly individualized inquiry defeating predominance. *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 736 (9th Cir. 2007) ("We agree that evidence about individual knowledge and expectations may help the court determine the extent of the harm for the purposes of the UCL's balancing test").[18]

Accordingly, Plaintiffs' "unfairness" claim necessitates inquiry into class members' individual expectations about the challenged practices. These will depend in turn upon myriad individual factors including prior experience with PPC advertising, level of sophistication, tolerance for risk, business or sector, any verbal

---

[18] In *Lozano*, the Ninth Circuit ultimately affirmed the district court's conclusion that predominance was not defeated because the defendant in that case had made uniform representations to all class members—a circumstance that plainly is not present here, as discussed above. *Lozano*, 503 F.3d at 736-37.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   representations made when they signed up, and any documents they read about

2   Citysearch's PPC advertising service before they signed up. *South Bay Chevrolet v.*

3   *General Motors Acceptance Corp.,* 72 Cal. App. 4th 861, 887, 895 (1999) (method

4   of calculating interest not "unfair" under UCL where plaintiff had entered into

5   contract "knowing, understanding, agreeing and expecting" that it would calculate

6   it by this method; noting relevance of many of same factors present here to

7   determine whether uniformity was likely in expectations among class members).

8       This variation is demonstrated by Plaintiffs' own unique experiences.

9   Redwolf, which had significant prior experience with PPC advertising through

10   other providers, had *no expectation* that it would be charged only for clicks by

11   potential customers and understood that it would have to pay for clicks that were

12   not from potential customers, including clicks by the "casual Web surfer." *See* p.

13   10, *supra*; Redwolf Depo. at 86:7-15. Redwolf also had *no expectation* that

14   Citysearch could guarantee that clicks would be from potential customers and

15   acknowledged that the advertiser bore that risk. *Id.* at 59:9-14. Menagerie, on the

16   other hand, which had done no prior PPC advertising, expected that it would pay

17   only for clicks on the "contact" portion of its business profile (whether from a

18   potential customer or not). *See* p. 10, *supra.* Its confusion arose from verbal

19   representations made by its Citysearch sales representative during enrollment. *Id.*

20   at 129:3-8; 68:19-69:21. Finally, each Plaintiff admitted it had no expectations at

21   all about Citysearch's fraudulent or invalid click detection processes or policies.[19]

22       *Second*, the UCL's "fraudulent" prong requires individualized analysis of

23   what class members saw or heard. Plaintiffs are correct that whether a practice is

24   "fraudulent" under the UCL focuses on whether the representations in question is

25   "likely to deceive" members of the public. Mem. at 17. But Plaintiffs are wrong

26   

---

27   [19] Redwolf Depo. at 192:2-6; Menagerie Depo. at 102:4-103:1. Indeed, neither Plaintiff read the "FAQ" page of Citysearch's website or the Policy, which are the

28   only published documents they have ever identified in this litigation in which Citysearch allegedly describes these steps to advertisers.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS      -29-     CASE NO. CV 08-04263 CAS (FMOx)
CERTIFICATION

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   that this obviates the need for any individualized inquiry concerning such

2   representations. *Id.* at 18. Even under such a standard, in the absence of any

3   showing that all advertisers were exposed to the same alleged misrepresentations—

4   which the class members here plainly were not—individualized inquiries remain.

5   *Hodes v. Van's Int'l Foods*, 2009 WL 2422214, *4 (C.D. Cal. July 23, 2009) (even

6   though individualized proof of reliance on allegedly deceptive statement is not

7   required of non-class representatives, common issues did not predominate where

8   many other individualized inquiries remained, including whether the products

9   purchased by each class member contained the purported misrepresentation); *South*

10  *Bay*, 72 Cal. App. 4th at 895 (where evidence showed differing ways for car

11  dealerships to have understood the challenged practice, no basis to conclude they

12  were similarly situated with respect to the "likelihood of deception" test); *see also*

13  *Stern*, 2008 U.S. WL 4382796, at *10 (absent evidence that defendant's sales

14  representatives used a "standardized script or forms when making sales calls,"

15  "unclear" how plaintiff could prove her claims on classwide basis).

16      Here, it is undisputed that the putative class members became advertisers

17  with Citysearch through different methods, and received different information, and

18  there is no evidence of any common script. As in the foregoing cases, such

19  individualized experiences defeat predominance.

20  **VII.   CONCLUSION**

21      For the reasons set forth above, Plaintiffs have not demonstrated all of the

22  elements required by Rule 23. The motion for class certification should be denied.

23  Dated:     September 10, 2009          FENWICK & WEST LLP

24

25                                        By: */s/ Laurence F. Pulgram*
                                              Laurence Pulgram

26                                        Attorneys for Defendants
27                                        IAC/INTERACTIVECORP and
                                          CITYSEARCH, LLC

28